July 27th, 1863.

---

## SUPREME COURT.

---

### HERMAN CAPLAN *vs.* EDWARD HOFFSCHLAEGER & FLORENS STAPENHORST.

A GENERAL authority conferred upon the master of a vessel to conduct a whaling and trading voyage for a limited period of time, is not to be extended as giving him the power to establish sub-agencies at different points beyond the period expressly set forth.

The principal is only bound by the acts of his agent within the scope of his general authority.

The principal may subsequently ratify the unauthorized act of the agent; but there is a distinction between a ratification of the acts of an agent duly appointed and the ratification of a contract made by a person without authority.

The principal by receiving the proceeds of the sale of goods, may have ratified their sale, but it does not follow that he has ratified a contract made by a person without authority to pay a certain amount of wages for services rendered in such sale.

The owner of the original goods is owner also of the property for which they were given in exchange by an unauthorized agent, and has a right to retain the possession when once it has come to his hands. Such unauthorized person, acting in good faith for the interests of the principal, is entitled equitably to a fair compensation for his services, but he can receive nothing upon a contract made with him by an agent of the principal, who, in making such contract, has exceeded his authority. Where, by the very nature of the transaction, a written authority is known to exist, it is the duty of persons dealing with the agent to make inquiries as to the nature and extent of such authority, and to examine it.

Submitted, by agreement, to the Court.

ALLEN, C. J.

This is an action of assumpsit brought to recover the amount due on an alleged contract of the defendants for services rendered. It is alleged that on or about the 27th March, 1862, the plaintiff entered into an agreement with the defendants by and through L. V. Lass, at Ebon or Boston Island, so called, to labor and trade at said Island for the defendants until the 27th of March last past, for the sum of sixty dollars per month, the interest on the said wages to be credited to the plaintiff every six months. To this declaration the defendants filed a plea of the general issue.

The counsel of the plaintiff offered in evidence the alleged contract made and executed by the plaintiff and L. V. Lass, captain of the brig " Wailua."

It appeared in evidence, that, in January, 1861, the plaintiff shipped as cooper on board the defendants' brig " Wailua," Lass, Master, for a whaling and trading voyage, and to return to Honolulu, for a period of sixteen months ; and that, on the 27th of March, 1862, by mutual agreement of the captain and himself, he was discharged from said brig and commenced labor on the Island of Ebon, in accordance with the terms of the agreement, and there continued till he left for this port, where he arrived in April last. The defendants deny the authority of Captain Lass to make this agreement, as their agent, and upon the evidence of this authority, as given in express terms, as is contended, or recognized by subsequent acts, the plaintiff's right to recover depends.

Mr. Banning, who was a clerk in the house of the defendants when the " Wailua" sailed in 1861, and continued in that capacity till January last, when he became a partner, testified, that the defendants proposed to try the experiment of a trade in cocoanut oil on some of the Southern Islands, and Capella, a clerk of the defendants, was sent down on the brig "Wailua," to be landed at Kings Mill or Marshall Islands at the discretion of the captain and himself, for the purpose of obtaining as much information as possible in regard to the trade. It was understood that Capella, the clerk, and Caplan, the cooper, should be left on one of the islands, while the brig was cruising. It

appears by the shipping articles that there were two coopers engaged, and this witness testifies that when Caplan was shipped, it was expressly understood that he was to remain on the island which might be selected, and do the coopering. It is very evident his services were not needed on the vessel, and the purpose of the enterprise could only be subserved by having a cooper on board, and another on shore where the oil was obtained, as the purchaser was obliged to furnish the casks and cooper them. By the terms of the shipping articles, the voyage expired in May, 1862, and Mr. Banning testifies that when Caplan signed the articles he was told distinctly of the length of time of the proposed expedition.

The "Wailua" did not return as the defendants had expected, and being apprehensive of her fate, they requested Captain Gelett, of the "Morning Star," who left here in June, 1862, to touch on his cruise at Ebon Island, and should he find Capella and Caplan there, to bring them and the oil and merchandise to Honolulu. Capt. Gelett returned in November following, and reported that he had found Caplan there alone, but that he could not bring the oil as his tackle was not strong enough. It appears further that the "Wailua" returned in September of the same year, and it was at this time that the defendant first learned that Caplan was left on the island by the captain, and of the agreement which he had made with him. They were much dissatisfied with the course taken by the captain, and so expressed themselves to him and Capella. It appears that Capella wrote the agreement, and he says that he did it under orders from the captain, and at the time advised him not to make it. As the "Morning Star" returned in November, without the plaintiff and the oil and merchandise, the defendants decided to charter the schooner "Maria" to send for Caplan and the oil and goods unsold. This proved also unfortunate, for the schooner was lost after the oil was placed on board of her. Capella when he returned to Ebon Island had orders to send Caplan up on the "Maria," and he was on board when she was wrecked, but he and the oil were landed in safety, and afterwards were brought up on the "Morning Star," which arrived here in April last. This witness produced an account of the net proceeds of the oil traded for by Caplan. It appears that the oil gauged

here 2879 gallons, which the defendants value at $1,583 45. The charges of merchandise, freight and passage of Caplan, casks, &c., amounted to $1036 and 29-100th dollars, leaving a balance of $547 and 16-100th dollars.

It is contended by counsel for the defense that, as Capt. Lass had no authority to make this contract, the action could not be sustained, and this is the first question to be examined and decided.

It is very evident that the purpose of the adventure was to select, if possible, a trading post on one of the Southern islands, for the purchase of oil in exchange for goods, while the brig was cruising for whales. This purpose was carried out. The brig was cruising, and Capella and the Captain had selected a trading station, at which place Caplan was doing his duty as cooper. The shipping articles limit the engagements of the men, Caplan included, to a period of sixteen months, and the evidence is very clear and explicit that the adventure was to terminate within the period stipulated in the articles. This is the only express authority given to the Captain. Had he then any authority to make new contracts by which he would establish a more permanent trade than that designed by the contract for the whaling and trading voyage ? We think not. That he had authority, by virtue of his office as master of the vessel, to discharge Caplan by mutual agreement, is undoubtedly true, but from that authority he had no right to engage him for a more permanent service. By the evidence, both written and oral, the contract made by the captain terminated by its own limitation. He had no right to detain the men longer than the period stipulated, unless it was occasioned by some power over which he had no control. This was due to the employees. He was under the same obligations to the owners. He had no right to devote the vessel to other purposes than that designed ; or to establish trading posts beyond the period stipulated. It put the property of the defendants beyond their control for a longer period than he had authority to do, and subjected them to the necessity of sending for the goods, or the oil for which they might be exchanged, to say nothing of the moral duty which might perhaps arise in sending for the man whom the captain had left in charge. It seems to us that the plaintiff had

every reason to understand the authority of the captain, because, in the shipping articles, the purpose and length of the voyage for whaling and trading was expressly set forth ; and further, he was distinctly told the period of the voyage, and it appears further that Capella remonstrated with the master when making the agreement. From the history of the enterprise, it is very clear that Caplan ought not to have suffered himself to have been imposed upon by the captain. We are aware, however, of the influence which masters of vessels very naturally exert over this class of men.

The counsel for the plaintiff contends that the Captain was a general agent, to do all of a certain business. This is true with this important qualification, that it was for a limited period. He was to be master of the brig "Wailua" on a whaling and trading voyage for the period of sixteen months. He was authorized in conjunction with Capella, to place Capella and Caplan on some island for the purpose of trading in cocoanut oil, and taking charge of the same for a given period, which was not to extend longer than sixteen months for the whole adventure. He had a general authority in regard to this particular adventure, but it was limited by the terms of the shipping articles. He had no authority to establish these agencies beyond the period expressly set forth. If he had authority to establish this agency at Ebon, he could have established others at other islands. If a person is held out to the public by the principal as having a general authority to act for and to bind him in a particular business, it would be unsound in law as in morals, as is contended, to allow him to set up his own secret and private instructions to the agent, limiting that authority, and thus to defeat the transactions under the agency, where the party dealing with him could have no notice of such instructions. In this case the presumption of such instructions is fully negatived. The principle is very clear, and there can be no controversy about it, that the principal should be held bound by the acts of the agent within the scope of his general authority. Time is one of the important powers of an agency. If it is limited, the agency ceases by its terms, and it is in evidence that he was told distinctly of the length of time to which the expedition was to extend when he signed the articles ; and it is expressly

agreed, as appears by the articles, that Caplan was to serve in a whaling and trading voyage for a term not to exceed sixteen months, or until the brig should return to the Islands. He was informed then fully of the master's authority. "When," says Mr. Justice Story, "a written authority is known to exist, or is by the very nature of the transaction presupposed, it is the duty of persons dealing with the agent to make inquiries as to the nature and extent of such authority, and to examine it." Here a written authority was known to exist, for the plaintiff had become party to it. The acts of a ship-master, as a general agent within the scope of his authority, are binding on his employers, but not beyond it. Suppose for example in a whaling and trading voyage to the Arctic for one season, the master should deem it a good business to engage his men to spend the winter in hunting for furs, and should employ some of his men for that purpose, would that come within the purview of the objects and purposes of the expedition as set forth in the articles, or would he be authorized by an implied authority as master? as Lloyd says in Paley on agency, "that it becomes the duty of the party dealing with one whom he knows, to be acting for another in the transaction, to ascertain by inquiry the nature and extent of the authority, and if it be departed from or exceeded, he must be content to abide the consequences." Because the master had authority to manage and conduct a whaling and trading voyage, it does not follow by its terms or by usage that he has a right to establish trading posts beyond the purpose of the voyage itself. To obtain oil by whaling and by trade, within the period limited, is the object and purpose of the adventure. The master of the vessel is not vested with power to force his employers to continue a business against their express injunctions or their will. That the master is liable to the plaintiff is beyond a doubt, for making an engagement which he had no authority to do. As the Captain had no authority to make the contract, the next question which arises is: have the defendants ratified it by any acts of theirs, which is equal in effect to precedent authority. It must be borne in mind that there is a very sound distinction between a ratification of the acts of an agent and the ratification of a contract made by an unauthorized agent, as in this case; the defendants by receiving the pro-

ceeds of the sale of the goods, have ratified their sale, but it by no means follows that they have ratified a contract made by a person without authority to pay a certain amount of wages for services rendered in the sale. Suppose for example, that a party without the slightest authority should authorize a person to take possession of a herd of cattle and manage and conduct the grazing business for the owner, and he should increase the herds by exchange, and when the owner discovered this interference with his property, he immediately took possession of his cattle, of the old stock as well as that acquired by exchange,—will it be contended that by re-investing himself in the actual possession of his property, although somewhat changed in form by the unauthorized interference, that he thereby ratifies the acts of the party who authorized the wrongful interference? A principal may be bound by the ratification of the unauthorized act of his agent, and also when the latter has improperly substituted another agent under him, the ratification of the principal of the acts of the sub-agent will to all intents and purposes bind him in the same manner as if he had given him the power of substitution. But this principle presupposes an agency. (Story on Agency, § 249.) The reasoning of the counsel for the plaintiff on the general question of ratification is satisfactory, but he errs in its application. Even if the acts of the defendants ratify the conduct of Caplan, it by no means follows that this ratifies the act of Lass in making the contract with him. The defendants repudiated the contract, and as we are of opinion there was no authority to make it, it falls, and Caplan is at work without a contract, but as there is no doubt he acted honestly under the circumstances, he is entitled equitably to a fair compensation for his services, but as the declaration contains only one count, and that, on the contract, we cannot give him judgment for the amount he would be entitled to recover on a *quantum meruit.* The counsel for the defendant claims that he should be paid according to the lay in the shipping articles. But it appears that he was legally discharged on the 27th of March, 1862. Captain Lass had a right, as master of the brig, to discharge his men by their consent. It may or may not have been judicious, but it is very evident he was invested with this power by virtue of his office. The error in the reasoning consists in this : that the

acts which ratify Caplan's doings, necessarily ratify Lass'. There may be unauthorized acts of several parties on an estate, or in any particular business, but it by no means follows that the ratification of the acts of one is the ratification of that of the others. Of Lass' acts there is no evidence of a ratification. When they heard of the execution of the contract they repudiated it. As the "Wailua" did not arrive when they expected, the defendants requested Captain Gelett in June to call at Ebon and bring Caplan and the oil and merchandise to this place. This act is in accordance with the shipping articles and original understanding, and is an additional act to show that there was no authority given to any one to make arrangements for continuing the trade beyond the originally stipulated period.

The counsel contends that the defendants ratified the contract when they were written to by plaintiff's counsel, and informed that if they refused to pay according to the contract, but would deliver up the oil, the plaintiff would pay all the expenses of securing it, and as they did not not do so, they ratified the contract. The oil and goods were the property of defendants ; Caplan had no right in it. As they owned the. goods, they owned the property for which they were given in exchange, and they had a right to take possession of it, as well as the goods unsold, wherever they could be found.

In this case Caplan was not an agent, and he ought to have returned in the brig according to the stipulations, but as he remained after the captain and clerk left and took charge of the goods and trade, as the Court have before intimated, he should have a reasonable compensation for his services. We are unable to see any ratification of Lass' contract arising from any communication with Caplan. It was Lass' duty, as Caplan knew, to have brought him and the property to Honolulu, but as he did not, he had no authority to make a contract with him to remain at a given rate of wages to take charge and dispose of the property. He thought proper to remain under these circumstances and take charge of the goods, and he should be paid a reasonable sum for it, without regard to the compensation fixed by Lass. He and Caplan had no authority to fix it, and it is very doubtful whether Caplan would be entitled to anything, had not the master of the ship left him there under

the peculiar circumstances of the case, for it was necessary for some one to take charge of the property. He was far more at fault than Caplan, and as he rendered service he is entitled to pay for it, but not on the contract declared on.

Judgment for defendants, with costs.

Mr. Harris, for plaintiff.

Mr. Montgomery, for defendants.